WILLIAM GAINOR v. THE CHEBOYGAN RIVER BOOM
COMPANY.

*Contract—Logs and logging—Damages.*

1. Under a log-running contract between a boom company and a
   contractor, it was the duty of the company to run the logs
   down to the mouth of a river, emptying into a lake, where
   they were confined by means of a " trip boom," so called, and
   were boomed out by the contractor by running a " bag boom,"
   so called, out into the lake, and opening the trip boom, and
   running out enough logs to fill the bag boom, which was tied
   up and towed across the lake, another bag boom being left at
   the mouth of the river to receive the logs from the trip boom·
   The contractor claimed that under the term " booming out" all
   he had to do was to swing the bag boom, open the trip boom,
   and keep men at the gap to run the logs out of the trip boom
   and pack them into the bag boom; while the boom company
   contended that it was his duty to go up the river far enough
   to get the logs required to fill the bag boom, and sought to
   recoup damages for his failure so to do. The meaning of the
   term " booming out," as used in the contract, was left for the
   jury to determine, who found in favor of the contractor, which
   finding is held to eliminate that claim of damage from the
   case, under the testimony.

2. Where a boom of logs broke and the logs were scattered in a
   lake in the fall of the year, and on the refusal of the contractor
   to pick them up and deliver them to the boom company it
   gathered up a small portion of the logs at an expense of 91
   cents per thousand feet above the contract price for their
   towing and delivery, such excessive cost being caused by the
   lateness of the season and the inclemency of the weather, and
   the boom company fails to show any damage growing out of
   the delay in the delivery of the remainder of the logs, which
   was made by the contractor the following spring, its action in
   attempting to gather up the logs cannot be justified, nor can
   it recoup, as damages, the expense thereby incurred in a suit
   by the contractor upon the contract.

Error to Cheboygan. (Ramsdell, J.) Argued April 24,
1891. Decided May 15, 1891.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

McKnight, Humphrey & Grant, for appellant, contended:

1. Parties in making a contract are presumed to contract with reference to the situation of the parties and the subject-matter, and in construing it these should be taken into account; citing *Mills v. Spencer*, 3 Mich. 127; *Spaulding v. Coon*, 50 Id. 622.

2. Upon plaintiff's neglect and refusal to pick up the logs that fall, it was unnecessary for defendant to wait longer for him to perform his contract, and particularly was this the case when logs were being injured by stones on the lake pounding into them, as shown by the testimony; citing *Hudson v. Feige*, 58 Mich. 151.

3. The duty to pick up the logs promptly was not cast upon plaintiff by law, but by his contract, and the lateness of the season or inclemency of the weather were not guarded against thereby; citing *Manufacturing Co. v. Dole*, 43 Mich. 372.

Oscar Adams (George E. Frost, of counsel), for plaintiff, contended:

1. The parties contracted in view of the exigencies that were liable to arise, and the plaintiff would be excused by any circumstances, arising without his fault or negligence, rendering performance impossible or grossly unreasonable; citing *Clark v. Moore*, 3 Mich. 55; *Cuddy v. Major*, 12 Id. 368; *Railroad Co. v. Burrows*, 33 Id. 6; *Manufacturing Co. v. Dole*, 43 Id. 370; *Wolfe v. Howes*, 20 N. Y. 197; *Dexter v. Norton*, 47 Id. 62.

MORSE, J. The plaintiff sued the defendant in the circuit court for Cheboygan county in *assumpsit* to recover an amount claimed to be due him for "booming out" of the Upper Black river, towing across Black lake, and driving down the Lower Black river, and delivering to defendant at a certain point, the logs in what was known as the "Upper Black River Drive." The work was performed under a written contract, and the plaintiff claimed.

that the balance due him was $686.84 and interest.   He recovered judgment for $573.79.

The defendant claimed to recoup damages for failure to perform the contract in three particulars, stated in defendant's brief, in short, as follows:

"1. That under the contract plaintiff was to boom the logs out of the Upper Black river, which, as alleged in the notice, he wholly neglected, omitted, and refused to do, and claims damage therefor.

"2. That plaintiff by his agreement contracted to deliver all the logs to the defendant in the season of 1888, but that he negligently and carelessly allowed a boom of logs to be broken up on Black lake in October, 1888, and neglected, omitted, and entirely refused to pick them up during the season of 1888, and claims damages therefor.

"3. That plaintiff by his agreement was to deliver the logs at the McDonald bridge as fast as practicable during the season of 1888, but that he failed to do so, claims damages therefor, and that under its notice of recoupment it should have judgment in its favor."

The contract between the parties was as follows:

"This memorandum of agreement made and entered into this 27th day of March, A. D. 1888, by and between William Gainor, of Cheboygan county, Mich., party of the first part, and the Cheboygan River Boom Company, of the same place, parties of the second part, witnesseth:

"Said party of the first part, in consideration of the prices per thousand feet as hereinafter stated to him to be paid by said second parties as hereinafter expressed, hereby agrees to boom out of the Upper Black river, tow across Black lake, and run, drive, and deliver to below the McDonald bridge, in Lower Black river, all of the saw-logs or timber which said second parties shall have coming out of the Upper Black river; also to receive logs or timber at any other points on Black lake, tow the same to Lower Black river and run, drive, and deliver to below the aforesaid McDonald bridge, which said Boom Company may have to handle during the season of 1888.

"The party of the first part agrees to receive the logs

at the several places above mentioned as soon as the parties of the second part are ready to deliver them, and to prosecute the work and deliver the logs to below the McDonald bridge aforesaid as fast as practicable, to the end that the logs shall all be delivered below the aforesaid McDonald bridge as early in the summer of 1888 as the ordinary circumstances will admit. The party of the first part agrees to do said work in a good and workmanlike manner, and to promptly pick up and collect all logs which may go astray or be scattered on Black lake, to the end that all logs received from said second parties by said first party shall be by him delivered below the McDonald bridge, in Lower Black river.

"The price to be paid to the party of the first part by the parties of the second part per thousand feet board measure, for the booming out of Upper Black river, towing across Black lake, and running and delivering below the McDonald bridge as aforesaid, shall be as follows: For booming out of Upper Black river, towing across Black lake, and delivering below the McDonald bridge, in Lower Black river, all logs or timber coming out of the Upper Black river, 9 cents per thousand; from the Rainy River and head of Black lake to below the aforesaid bridge, 10 cents per thousand; from all other points on Black lake to below the aforesaid bridge, 9 cents per thousand.

"The parties of the second part agree to furnish booms and chains for towing across Black lake, and at all other points (except the logs coming out of Upper Black river) the logs shall be delivered to first party in booms.

"The party of the first part shall receive pay at the schedule rates per thousand for such quantity as the said Boom Company shall agree with the several owners of the logs, payments to be made from time to time as the work progresses, not to exceed seventy-five per cent. of the amount of work estimated to be done, and final payment to be made when the work is all completed, and the amount of logs handled ascertained.

"It is understood that the party of the first part shall tow the empty booms to the several points where the logs are received, at his own expense, and that the parties of the second part shall use due diligence in assorting the logs at the assorting gap in Lower Black river, but shall not be required to receive the logs faster than they can assort them."

In relation to the first claim of recoupment, the meaning of the term "booming out" was left to the jury to determine from the evidence introduced upon both sides. The logs in the Upper Black river were prevented from running out into the lake and scattering by means of a boom at the mouth of the river, called a "trip boom." It was virtually conceded upon the trial that it was the duty of defendant, whose men were driving the river above, to run the logs down into this trip boom. The plaintiff "boomed out" the logs by placing what is called a "bag boom" from the mouth of the river out into the lake. He would then open the trip boom, and run the logs out of it until the bag boom was filled. Then the bag boom would be tied, inclosing the logs thus run out of the trip boom, and towed across the lake to the head of the Lower Black river, and then emptied into that stream. While one bag boom was being towed across and emptied, another would be left at the mouth of the Upper river to receive the logs from the trip boom.

The plaintiff claimed that under the term "booming out" all he had to do was to swing the bag boom, open the trip boom, and keep men there, at the gap of the trip boom, to run the logs out of that boom and pack them in the bag boom. The defendant claimed that it was also his duty to go up the Upper river far enough to get the logs required to fill the bag boom, and that by his failure to do this he was responsible to it for the labor it was obliged to expend in doing such work at different times. The defendant gave evidence tending to show that plaintiff refused to do the work of "booming out," as defined and contended for by defendant, and neglected to put on sufficient men to do this work at the trip boom, and defendant was obliged to do the work at times, which work was worth from two to three cents per

thousand feet. The defendant claimed $524.70 for this work.

It is evident that the jury found with the plaintiff upon this contention as to the meaning of the term "booming out" as used in the contract, and this claim of damage is out of the case, and with it go also some of the allegations of error.

Under the second head it is admitted that about the 20th day of October, 1888, a boom of several hundred thousand feet of logs broke while at the mouth of the Upper river. There was a conflict in the evidence as to who was responsible for the breaking of this boom. The plaintiff did nothing towards picking these logs up that fall. He claims that Egbert Smith, the president of the defendant corporation, told him he might leave them in the lake until spring. Smith denies that he told him so, but says that he did tell him that, as far as Thompson Smith's Sons' logs were concerned, he might leave them, and, if he got permission from the owners of the other logs in the drive, he might leave them all. Plaintiff does not claim that he got permission from the other parties. Defendant claims that plaintiff was frequently requested and required to pick up these logs, but refused to do so, and that defendant commenced doing so on or about the 10th of November, 1888, and picked up 270,-000 feet at an expense of $1 per thousand. The remainder were left in the lake, and picked up by plaintiff in the spring. In regard to this matter, the court charged the jury correctly that, if Egbert Smith told plaintiff he might leave the logs in the lake until spring, the defendant could not recover for the work done in picking them up in the fall; and also:

"As to the gathering up the broken boom of logs which became scattered on Black lake, you are charged that if on the 10th day of November, and after that,

that being the time when defendant undertook to gather them up, if the season was too far advanced, and the weather too inclement, to make it reasonably safe and proper to do the work, then defendant was not justified in making the attempt at plaintiff's expense."

There was some evidence tending to show that the boom was broken and the logs scattered by the carelessness of defendant's men in interfering with it, without authority from plaintiff; but on the trial no question was raised on this account, and therefore no argument in favor of plaintiff based upon this evidence can be heard to sustain the correctness of this instruction. We think, however, under the circumstances of the case, the charge was not erroneous. The testimony shows that, owing to the lateness of the season and the inclemency of the weather, the defendant was unable to pick up but a small portion of the logs, and those at an expense of one dollar per thousand feet, when the contract price of booming out, towing across, and running down the Lower river to the bridge, was only nine cents per thousand feet. It does not seem to us that there are any facts of damage to the defendant, in case the logs were left in the lake until spring, shown in the record which would justify the defendant in making this expense. No evidence was given showing that the defendant suffered any damage at all from or on account of the logs that were left in the lake and taken out in the spring by plaintiff. It was shown that logs would be damaged by pounding against the shore and filling with gravel, but it was not shown that defendant received any less from the owners of these logs because they were not picked up and run out in the fall.

As to the third head of damage the court charged the jury as follows:

"That by the practical construction of the contract,

given to it by the parties themselves, there was no absolute limitation as to the time within which the work should be done, and plaintiff was entitled to a reasonable time within which to complete the-work."

This charge must be considered as relating to the logs left in Black lake from the broken boom, and not picked up in the fall, as all the other logs were delivered in 1888. It is insisted by the defendant's counsel that this charge, in effect, practically took away from the consideration of the jury the testimony of the defendant that none of its officers in any way consented to these logs remaining scattered in the lake during the winter, and instructed them as a matter of law that the delivery need not have been made in the season of 1888, as specified by the contract. The explanation of the meaning of this particular instruction by plaintiff's counsel is that the contract was made in March, 1888; that the contract was to deliver the logs on the defendant's sorting ground below McDonald's bridge as early in the *summer of 1888* as was practicable; that the words "summer of 1888" did not mean *season* of 1888; that the parties evidently intended but one drive at the time the contract was made.

The testimony shows that the first drive, a big one of 20 million feet, come along in the spring, and was all delivered within the time stipulated. About two months afterwards, after the *summer* months of June, July, and August had passed, another drive came down of six or seven million feet, which could not be delivered in the summer. Consequently by taking this drive into the contract the parties practically agreed that the plaintiff was only required to deliver them below the bridge "as fast as practicable, and as the ordinary circumstances would permit."

We do not think it necessary to discuss or determine

what the court meant by this instruction. Whether it was right or wrong, it could not have harmed defendant, in our opinion. As before said, no damage was shown because of these logs not being delivered until spring, and we can find nothing in the contract authorizing the defendant to pick up these logs after the 10th of November, when they could not be picked up without involving an expense of one dollar per thousand, and to charge the plaintiff for it. It must be considered that the defendant, under the testimony and the circumstances of the case, was not entitled to receive any damages for the neglect of the plaintiff to pick up these logs in the fall.

Error is claimed in the giving of the following request:

"If you find from the evidence that plaintiff kept the space in the Lower river filled as rapidly as defendant passed the logs through the sorting gap and gave him space, that is all that could be required of plaintiff, and defendant would not be justified in interfering with the work."

This instruction was correct. The contract expressly provides that plaintiff shall not pass the logs in the Lower river faster than the defendant can assort them. Defendant claims that it was the duty of plaintiff to tow booms out in the lake and hold them there, so as to expedite the work of defendant's men in getting the logs down the Upper river. We find nothing in the contract imposing this duty upon plaintiff; and, besides, there is no showing that any logs were left in the Upper river, because of the failure of plaintiff to take the logs away from the trip boom more rapidly than he did, and therefore no damage.

Some errors are alleged in regard to the admission and rejection of testimony upon the trial, but we are not able to find any. The case was fairly tried, and the

charge of the court was as favorable to the defendant as the law would permit.

The judgment is affirmed, with costs.

CHAMPLIN, C. J., McGRATH and GRANT, JJ., concurred. LONG, J., did not sit.