H. E. NORMAN and E. E. Ross, Plaintiffs-Respondents,

v.

Rufus W. McLELLAND, Defendant-Appellant.

No. 7978.

Springfield Court of Appeals. Missouri.

March 8, 1962.

Hogan & Hogan, Robert E. Hogan, West Plains, William C. Jenkins, Mammoth Spring, Ark., for defendant-appellant.

Green & Green, H. D. Green, West Plains, for plaintiffs-respondents.

RUARK, Presiding Judge.

This is a suit for damages based upon the failure of defendant to comply with the terms of an option for the sale of land. From an adverse jury verdict awarding damages to plaintiffs in the sum of $4,000, the defendant has appealed.

The option agreement involved, given for "one dollar and other valuable considerations," was dated November 24, 1959, described the land, gave plaintiffs the option for six months "from date hereof" at $15 per acre, "and first party agrees to furnish deed conveying above land with Abstract of title covering the above land, and title to be marketable. If not ask (sic) to furnish title within said period then this option is null and void." The agreement was signed and acknowledged (incidentally, before separate notaries) by the parties.

The petition charged that defendant McLelland was the owner of 1000 acres of land in Oregon County; that for valuable consideration he gave the plaintiffs Norman and Ross the written option as above stated; that within the period of said option they deposited the full purchase price ($15,-000) in the Bank of Alton and notified defendant both orally and in writing of the exercise of such option, but that defendant breached such agreement by failing to give deed or furnish an abstract showing marketable title; and by reason thereof they were damaged in the sum of $4,000.

Defendant's answer admits that he signed the "purported option agreement" but states that it was not the true agreement, inasmuch as, on November 20, 1959, (this was before the written instrument was executed) he told plaintiffs he would give them a *60-day option;* that when the instrument was presented to him he signed it without reading it, and his signing it was the result of a wicked and fraudulent scheme; further, that after he discovered the mistake he talked with the plaintiffs about it, and they verbally agreed to consider the option null and void.

According to the evidence, including defendant's testimony, plaintiffs approached the defendant for the option and there was some discussion about their attempting to find a buyer. They (plaintiffs) were "pretty sure" they could find a buyer. Mr. Norman said he thought he had a buyer from Louisiana, and, "Well, I offered it for sale." Defendant could read and write, had on his glasses, took the paper in his hand, looked at it, and had ample opportunity to read it but says he did not do so. No trick or artifice was practiced. Afterward defendant acknowledged the instrument and kept a copy.

Defendant contended and so testified that afterward he discovered the option was for six months instead of 60 days as he had intended; that he went to the plaintiffs separately and they verbally agreed to consider the option as null and void. This is denied by both plaintiffs, and *if* this amounted to a cancellation of the agreement (the court permitted defendant to submit it), we must take the jury's verdict as foreclosing it.

After the option was signed, the plaintiffs cast their net, incurred expense (in an amount not shown), made calls, got in touch with possible buyers in various places, including Louisiana, showed the land to men from Blytheville, Arkansas, and Memphis, and finally induced two men from Texas to come and be shown over the land. This apparently was on or near to May 14, 1960. The Texans indicated interest in the land and stayed over Sunday and until Monday afternoon. Plaintiffs told the prospective purchasers that they expected to make some money on the deal, and the prospective purchasers agreed that was all right with them. Sunday night plaintiffs went to see McLelland and told him they thought they were going to get the place sold and that the purchasers had asked

until Wednesday night to give a definite answer. Defendant testified, "Oh, I believe Mr. Ross spoke of $5,000, going to send $5,000 to bind their trade." At that time defendant told plaintiffs, "Well, I have sold off two hundred acres of it," but "it hasn't went through yet." He said he would go see the man to whom he sold it and he thought he could get it back. Thereafter plaintiffs completed an agreement (apparently partly in oral conversation, by correspondence, and by phone call) to sell the land to "the Texas men" for $19,000. On Wednesday the plaintiffs got a call from the prospective purchasers stating they were ready to do business. On the next day plaintiffs went to defendant, told him the purchasers were ready to do business, and asked him if he had made his arrangements to get the land (the 200 acres) back. At that time he said that "he didn't aim to" and "flatly refused" to go ahead with the option. This defendant admits. On May 21, 1960, plaintiffs mailed to defendant a registered special delivery letter, stating that arrangements had been made at the Alton bank to pay for the land in compliance with the option after title was examined. The following day the defendant refused to accept delivery of the letter from the postmaster. We will credit him with being facetious in the reason he offered, i. e., "Well, I wasn't supposed to get a registered letter from anybody. It might have had a bomb in it, just might have had a missile in it." There is some evidence that along about this time defendant went out of town to one place but told people he was going to another place. He first testified he had no recollection of it, but in another instance:

"Q. Why did you tell Mr. Crews you were hiding out? Why did you tell Mr. Crews that if you thought the option had run out?

"A. Just a joke, I guess.

Asked if he had asked one Doug Geering "to get in touch with these men in Texas and stall them off until after the option time," his answer was, "I might have done that."

Plaintiffs produced the deposition of the "Texas men," who testified that they owned some property jointly and intended to purchase this land jointly; that they looked at the land and agreed (with plaintiffs) to pay $19,000 in cash and were in position to do so; that title was to be examined and if title was marketable they were to pay the purchase price upon delivery of deed; that the deal fell through because plaintiffs notified them the owner refused to go through with it. "We kept the matter open for a while to give them [time] to work it out. Finally Mr. Ross told us that the deal would have to be called off because the owner of the land would not go through with the deal."

"Q. If the deal had gone through were you ready, able, and willing to comply with the terms of the contract and pay $19,000 cash for the one thousand acres of land?

"A. Yes, sir, subject to good title we were willing and able to close the deal and ready to pay cash if they had delivered us the deed."

There was no evidence from either party as to the market value of the land other than as above stated.

Suit was filed on June 11, 1960.

The first assignment is that there was no evidence to support a verdict assessing plaintiffs' damage at $4,000, because there was no evidence to show that plaintiffs had ever concluded an enforceable contract for the sale of the land, for the reason the prospective purchasers' obligation to perform was conditioned upon the acceptance of title by a particular attorney.

To support this contention the appellant cites cases dealing with contracts wherein the determination of title, and hence enforceability of the agreement, is left to the sole judgment of one certain person. In so doing appellant skips over the first part

of his premise, i. e., that plaintiffs could not recover damages unless they actually had a binding and enforceable contract with their buyers. He cites no cases in support of such premise and we do not find the law to be such when applied to the facts of this case.

▇ No question has been raised in regard to pleadings or reception of evidence, and no contention has been made as to whether special damages were involved. Without wandering too far down the trail in respect to the recovery and measure of damages, we refer again to the fact that, by the testimony of both parties, the option was given and accepted with the understanding that the plaintiffs were to attempt to find buyers, and that this was the end result within the contemplation of the parties. The uncontradicted evidence is that plaintiffs did find buyers ready, willing, and able to pay in cash the full purchase price, subject only to delivery of marketable title, and the evidence is sufficient to justify a finding that defendant was not in good faith as regards performance. This transaction failed of consummation, not because the plaintiffs did not (if in fact they did not) have an ironclad contract with the prospective purchasers, but because, according to defendant's own testimony, (a) he voluntarily put it out of his power to convey title and (b) he flatly refused to proceed further with the deal. Under these circumstances we think that the plaintiffs were entitled to recover for what some cases and texts refer to as "the loss or value of their bargain" or "the value of their contract."[1]

▇ The agreement in question, although it took the form of an option contract, was, in the contemplation of the parties, a broker's contract, and such option contracts which are in substance brokers' contracts are at least related to brokers' contracts by the courts. See Mitchell v. Philippi, 359 Mo. 754, 223 S.W.2d 441. Actual tender of the purchase price or other action necessary to "wrap up" the transaction on the part of plaintiffs or their assignees was not necessary where, because of defendant's refusal, it became plain and obvious that such action would become a useless gesture. Cooper v. Mayer, Mo., 312 S.W.2d 127, 130; Frank A. Gilbert Realty Co. v. Timmerman, Mo., 183 S.W.2d 131, 133. Hence it would appear to us that where the evidence shows that the option holder had in good faith a purchaser or purchasers ready, willing, and able to pay an agreed sum, and the transaction failed because of the refusal of the owner to comply therewith, and not through any unwillingness or inability of the option-holding purchasers or the would-be purchasers from the option holders to proceed, the loss to the option holders by breach of the contract, the loss of the bargain, has been established.

Nevertheless, for the purpose of this opinion we will accept appellant's premise, assume that it was necessary that there be a binding contract of resale, and examine the contention that the resale was conditioned upon the acceptance of title by a particular attorney.

▇ It is true that the parties may by their contract make the performance conditional upon the determination of some fact or question by a third party, and if such appears to be the actual intent of the parties as evidenced by the contract, it is of course binding. School District of Kirksville v. Mississippi Valley Trust Co., Mo. App., 116 S.W.2d 146, 149; Ives v. Crawford County Farmers' Bank, 140 Mo.App. 293, 124 S.W. 23; Thompson v. Dickerson, 68 Mo.App. 535, 539. The leading case on this appears to be the Kirksville case, supra,

---

1. Krepp v. St. Louis & San Francisco Ry. Co., 99 Mo.App. 94, 103, 72 S.W. 479; Kirkpatrick v. Downing, 58 Mo. 32; Hartzell v. Crumb, 90 Mo. 629, 638, 3 S.W. 59, 61; Young v. Raupp, Mo. App., 305 S.W.2d 731; Wilt v. Waterfield, Mo., 273 S.W.2d 290; 55 Am.Jur., Vendor and Purchaser, § 555, p. 948; § 566, p. 959; 48 A.L.R. 12, anno.; 68 A.L.R. 137, anno.; 92 C.J.S. Vendor and Purchaser § 593, p. 647; 25 C.J.S. Damages § 43, p. 519, et seq.

where the determination of the validity of a bond issue (a specialized practice not too familiar to the ordinary practicing attorney) was left to a certain attorney who found questions raising such doubt as to destroy marketability. These questions were later resolved by the courts in favor of validity. Nevertheless, the court held that, since the parties agreed to accept this attorney's judgment, the condition was a part of the contract.

But unless it clearly appears from the contract that the examining party is to have the power to exercise arbitrary judgment, the person so acting cannot exercise such judgment in a way which is arbitrary, capricious or in bad faith. In other words, he couldn't declare a title, plainly marketable, to be unmarketable, and thus relieve either of the parties from the duty to consummate. Cummins v. Dixon, Mo., 265 S. W.2d 386, 393(5); P. R. T. Inv. Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 318; Knisely v. Leathe, Mo., 178 S.W. 453, 458 (5).

 In ordinary circumstances, and in the absence of contrary agreement, there is an implied obligation on the part of the vendor to furnish a marketable title (Wiemann v. Steffen, 186 Mo.App. 584, 172 S.W. 472; Hirlinger v. Hirlinger, Mo.App., 267 S.W.2d 46, 49, 44 A.L.R.2d 1207; McPherson v. Kissee, 239 Mo. 664, 144 S.W. 410), not such a title as will necessarily comply with unwarranted requirements of the buyer's attorneys.[2] As we interpret the evidence, all the would-be purchasers wanted in this case was a good and marketable title. One of them said, "I told him we would buy the 1000 acres and pay $19,-000 and pay cash for it subject to examination and approval of title." The other testified, "Mr. Ross was to bring the abstract of title to Breckenridge where we would have our attorney examine it. If the title was good and marketable we were

to pay the money at the time a deed of conveyance was delivered to us for the land. The whole thing hinged on it being a good title." We fail to find anything in this transaction which delegated to a third person the arbitrary power of life and death over the contract regardless of whether the title was actually good or bad. True, the buyers were going to take the abstract to their own attorney for examination. This is the usual and common practice. The buyer takes the abstract to his attorney "to be passed on." If he does not at some time in the proceedings state that title is to be "subject to my attorney's approval," it would be unusual. The usual practice then is for the attorney to point out any defects, and, if such are correctible within a reasonable time (in absence of special provisions as to time), the seller is allowed such time to correct them and deliver the deed. Bunyard v. Farman, 176 Mo.App. 89, 161 S.W. 640; Lumaghi v. Abt, 126 Mo.App. 221, 103 S.W. 104, 107. We believe that the conversations here related are not different from those commonly used in transactions of this kind, and we believe that such conversations did not amount to a limitation of the offer or agreement, as the case may be, so that the conclusion of the transaction was subject to the arbitrary rejection by the purchasers' attorney. And even though this were true, there is nothing to indicate that the good title which defendant contracted to convey would have been so rejected. On the contrary, since the defendant contracted to deliver good title, we think it fair to assume that in all probability, had he done so, such title would have been accepted and the transaction completed.

The remaining contentions deal with plaintiffs' sole (given) instruction, which hypothesized the fact that defendant granted plaintiffs an option to purchase the tract within six months at $15,000; that the consideration for such agreement was that

2. Green v. Ditsch, 143 Mo. 1, 44 S.W. 799, 802; Jamison v. Van Auken, Mo., 210 S.W. 404, 414; Wiemann v. Steffen, 186 Mo.App. 584, 172 S.W. 472, 474; Kling v. A. H. Greef Realty Co., 166 Mo.App. 190, 148 S.W. 203, 205.

plaintiffs were to attempt to find parties who would purchase during the option period; that plaintiffs spent time and money in an endeavor to find buyers; that plaintiffs exercised their option of purchase within the six months' period and were ready, willing, and able to carry out its terms by the payment of the sum of $15,000 upon defendant's furnishing a deed conveying the land, with an abstract of title; that plaintiffs notified defendant of exercise of such option, and that defendant failed and refused to comply with its terms and failed to furnish deed of conveyance or abstract; that as a direct result of such, plaintiffs have been damaged; and (on such finding) the instruction authorized a verdict for plaintiffs and allowance of such sum as the jury might find plaintiffs had been damaged as a direct result of the breach of the option agreement.

■ The first complaint is that the instruction failed to hypothesize and require a finding, as an essential element of plaintiffs' case, that the defendant was given a reasonable time to comply with the plaintiffs' demand. This *could* have been an essential element had that been any issue in this case (see cases supra), but here all the evidence shows that the allowance of a reasonable time was not involved. The defendant did not permit the transaction to get that far. According to plaintiffs' evidence, "he said he flatly refused" to go ahead with the option. "Just sue me." According to the defendant, "I said, 'This six month option has already been declared null and void and you can't claim deeds from

me,' and I said, 'I won't sign a deed.'" It was after this that plaintiffs' registered letter containing written demand was refused. The question of reasonable time to comply was not an issue in the case. It should not be necessary to hypothesize a conceded fact. Welch v. McNeely, Mo., 269 S.W.2d 871, 877; Meade v. Kansas City Public Service Co., Mo., 250 S.W.2d 513, 515.

The final assignment is that the instruction did not give the jury any instruction as to the measure of damages and that it amounted to a roving commission.

■ True it is that the measure of damages is for the court to declare, not for the jury to guess at.[3] Instructions in tort actions are often given with directions to the jury to award such damages "as you find from the evidence will reasonably compensate him for such injuries and disability," et cetera.[4] And such general submission of damages is not precluded in contract cases. Brunner v. Stix, Baer & Fuller Co., 352 Mo. 1225, 181 S.W.2d 643, 652. The defendant did not request any instruction on the measure of damages.

■ The general rule is that if a submission contains no misdirection and is good as far as it goes, but is general in its terms, then if the opposite party desires further clarification or limitation in the instruction, it is his duty to offer a qualifying instruction.[5]

■ But, assuming that the instruction was erroneous, it would appear that under

3. Doll v. Purple Shoppe, 230 Mo.App. 256, 90 S.W.2d 181, 186; Rhodes v. Holladay-Klotz Land & Lumber Co., 105 Mo.App. 279, 79 S.W. 1145, 1155.

4. Martin v. Kansas City, Mo., 340 S.W.2d 645, 650; Rush v. Hollingsworth, Mo. App., 89 S.W.2d 535, 536; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S.W.2d 1079, 1082, cert. den. Atchison & Eastern Bridge Co. v. Clark, 290 U.S. 701, 54 S.Ct. 229, 78 L.Ed. 693; Luikart v. Miller, Mo., 48 S.W.2d 867, 870.

5. Crivello v. Kline, Mo.App., 290 S.W. 86; Brunner v. Stix, Baer & Fuller Co., 352 Mo. 1225, 181 S.W.2d 643; Davis v. Kansas City Public Service Co., Mo.App., 223 S.W.2d 1, 7, and cases there cited, aff. 233 S.W.2d 669; Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., Mo.App., 210 S.W.2d 700, 705; Ross v. Wilson, 236 Mo.App. 1178, 163 S.W.2d 342, 348; Luikart v. Miller, Mo., 48 S.W. 2d 867; Martin v. Kansas City, Mo., 340 S.W.2d 645, 650.

the evidence in this case and the condition of this record, the amount of damages found, $4,000, was the only amount which *could* have been found. There was no evidence from which *any* other amount could have been arrived at. Hence, in any event, the instruction resulted in no prejudice.[6]

The judgment is affirmed.

McDOWELL and STONE, JJ., concur.

6. Doll v. Purple Shoppe, 230 Mo.App. 256, 90 S.W.2d 181, 186; Gaty v. Sack, 19 Mo.App. 470, 477; Wm. S. Merrill Chemical Co. v. Nickells, 66 Mo.App. 678, 687; Shinn v. United Railways Co. of St. Louis, 248 Mo. 173, 154 S.W. 103, 106; Heil v. St. Louis, Iron Mountain & Southern Ry. Co., 16 Mo.App. 363, 369.